## C. E. WILLIAMS *vs.* THE PANTHEON STABLES.

### EXCEPTIONS.

HEARING, AUGUST 4, 1890.  DECISION, SEPTEMBER 9, 1890.

JUDD, C.J., McCULLY AND BICKERTON, JJ.  DOLE J., DISSENTING.

The defendants, livery stable proprietors, owned several hack carriages. Their mode of business was to let or give them to be plied as hacks to drivers for whom they procured driver's licenses. The drivers paid the defendants $30 per week for a hack with two horses, maintained by the defendants and running from their stand. The drivers sought business and took for their own benefit the proceeds above the reserved receipts. The defendants exercised the right to discharge or temporarily suspend a driver for misconduct.

Held, that these circumstances and the statute, Chapter 27 of the Laws of 1884, constituted the driver a servant of the defendants, rendering them liable for damage resulting from collision.

### OPINION OF THE COURT, BY McCULLY, J.

This was an action of trespass on the case, arising out of a collision of horses, in which the plaintiff's horse received a fatal injury. It was tried before Bickerton, J., without a jury, who ordered judgment for the plaintiff. The defendant took the following exceptions, viz:

1.  To the finding that Frank Lillis, the driver of the express (hack) which collided with the plaintiff's team, was defendant's servant.

2.  To the refusal of the Trial Justice to find that the plaintiff was guilty of contributory negligence in driving without lights.

3.  That the damages are excessive.

The evidence as taken by the court stenographer is appended to the Bill of Exceptions; such parts of it as are necessary will be found in the opinion.

The defendants are D. H. Davis and H. R. Macfarlane, doing a livery and hack business as The Pantheon Stables. They have several hacks, for each of which they take a license and pay a fee to the Government. This is distinct from the license paid for their general livery business. The hacks are numbered and the license applies to the hack by its number. The drivers are individually licensed by numbered licenses as drivers.

Frank Lillis, who drove the hack in the collision, had the use of a hack with two horses of the defendant at $30 per week. The carriage and horses were maintained and stabled by the defendant. The driver took them out whenever he pleased and plied them as a public hackman, getting what fares he could. His remuneration would be what he made above the $30 per week. He was licensed under the following request from the defendant, addressed to the Inspector of Drivers and Hacks: "Please give Frank Lillis license for driving No. 49." This is done by the provisions of Chapter 27 of the Acts of 1884, viz., "Any person or firm having one or more licensed vehicles may make application to the Marshal or his deputy for a certificate to enable a person to obtain a license to drive; and the Marshal or his deputy, on being satisfied that the person recommended by the applicant is a competent driver, shall grant him a certificate to that effect, upon presentation of which to the Minister of the Interior the person applying shall receive a license, which license shall be used only and be valid so long as the person receiving the same shall remain in the employ of and drive for the person or persons making the application for such license; the fee for which shall be the sum of one dollar and which license shall remain in force for one year."

The stables did not prescribe the hours or direct the efforts of the drivers in obtaining business. It maintained a stand where hacks in waiting might stand, and a telephone and service of it through which their hacks might receive orders. There were more applicants for the position of hack drivers than they had carriages to let. "We have quite a number of applications; we could not accept them all as we have not hacks

enough.   We have applications that we turn away frequently, because we know they are unfit." (Testimony of Davis, deft.) The stables claimed the right to take away the carriage of any driver who was drinking or intoxicated, altogether or for such time as it judged fit. "If any of our hack-drivers misbehave sufficiently to warrant it, I discharge them." (*Ibid.*) This right had been exercised towards Frank Lillis on the day of the collision. His hack had been taken away from him and put in the stable on account of his intoxication. About one or two o'clock he asked Mr. Davis for it, who answered: "No, you can't have your hack." "I saw he had been drinking something. 'Well,' he says, 'I have got a load at the hotel at four o'clock,' and I said, 'you go home and sleep and come back at four o'clock and you can have your hack.'" (Testimony of Davis.) The foreman of the stables, Cavanaugh, testifies that he had orders to take away the team of any one drunk, and that he took away Lillis' this day and restored it to him about four o'clock P. M.

Under these circumstances was Lillis the servant of defendant? A case in point is that of *Powles vs. Hider*, 6 Ellis & Blackburn, 208. The defendant was the owner of cabs in London. Drivers, who by Act of Parliament must be licensed, paid defendant a sum each day for the use of the cab and two horses for fifteen hours, the driver depositing his license with the owner of the cab. Every cab was plainly marked with the name of the owner, and was licensed.

It was held that the defendant owner was liable as for the act of his servant for the value of baggage lost through the negligence of the driver. Lord Chief Justice Campbell said that if the contention of the defendant was right, that in point of law the cab and horses were let to hire to the driver, and that the driver became the bailee, he could not render the defendant liable; but, "looking to the position of the proprietor and the driver of the cab under the circumstances proved, and to the Acts of Parliament which regulate their respective duties, we are of opinion that the driver is to be considered the servant or agent of the proprietor. There can be no doubt that this would

be so if the driver were engaged at fixed wages, accounting to the proprietor for all the earnings of the cab. But must not the actual arrangement between them be equally considered a mode by which the proprietor receives what may be estimated as the average earnings of the cab, minus a reasonable compensation for his labor?"

The circumstances of this case, and the law, bring the case at bar within this reasoning. The defendants had "recommended" Lillis to be licensed as a driver of one of their cabs, and his license was valid only so long as he drove for them. They had selected him out of a large number making application. They had the power to discharge him for misconduct, or to suspend him for any time. His hack proceeded from the defendants' stand, and bore the number of one of their licenses. He was not directed by the defendants as to the hours of his service, or provided with business by them, the terms of his service imposing diligence on him, and avoiding for the defendants the risk of a dishonest accounting. For illustration, let it be that a person had hired a carriage and horses of the defendants for a hack business of his own, procuring a license for the hack, and for himself as a driver. Doubtless the hirer would be the bailee of the property, and the defendants would not be liable for his contracts or torts. Such a case would be materially different from this under consideration, and the difference would constitute the one person a servant and the other a bailee.

This conclusion may also be considered a statute interpretation or condition, from the words "which license shall be used only and be valid so long as the person receiving the same shall remain in the employ of and drive for the person or persons making application for such license," and our decision might be based on this solely. Any other conclusion would nullify the apparent purpose and objects of the law requiring licenses for hacks and licenses for drivers, which are to place them under police control, and to identify the carriages and drivers.

The finding that the plaintiff was not guilty of contributory negligence in driving without lights in this particular case, and the determination of the value of the plaintiff's horse, are upon

matters of fact. Examining the evidence, we find no reason for setting them aside; on the contrary, they are well supported.

The exceptions are overruled.

### DISSENTING OPINION OF DOLE, J.

It is clear to me that in the authorities referred to in the opinion of the Court, the relation of master and servant was considered to exist between the owners and drivers of the London cabs, purely by virtue of the English statutes. "I agree that, independently of the Acts of Parliament relating to this subject, the relation between them would be that of bailor and bailee, not that of master and servant. * * * But I think that the provisions of the Acts of Parliament alter what would otherwise be the relation of the proprietor and the driver, and for the protection of the public produce the result that, as regards mischief done by the driver, who is selected by the proprietor, the relation of master and servant so far exists as to render the proprietor responsible for the acts of the driver." *Venables vs. Smith*, 2 L. R. Q. B., 282. This is supported by *Powles vs. Hider*, 6 E. & B., 208, the authority quoted in the opinion of the Court, and by *Fowler vs. Lock*, 7 L. R. C. P., 272. The latter authority, indeed, which was an action brought by the driver of a cab against the owner for damages for furnishing with the cab an unruly horse which injured the plaintiff, goes further and somewhat weakens the force of *Powles vs. Hider*. The majority of the Court in *Fowler vs. Lock* decided that as between the owner and driver of the cab, the relation was not that of master and servant, but that of bailor and bailee; and Judge Wilde, who dissented from his associates, said: "In deciding this case against the defendant, we should seem directly to overrule the reasoning of the Court of Queen's Bench," (in *Powles vs. Hider*.)

We have then to find in our statutes enactments which, like the English Acts, create the relation of master and servant between a hack-owner and driver, as regards mischief done by the driver to the public in the prosecution of his work as driver, before we can hold the defendant in this cause responsible to

the plaintiff for the injury complained of.  As our law library does not contain the English laws referred to, we are left to find them so far as is possible in the authorities quoted.

Statute 1 and 2, W. IV., c. 22, § 6, prohibits any person from keeping, using or letting to hire any hackney carriage within the metropolis without a license.  Section 20 *Id.*, requires that a plate shall be affixed to the carriage on " which there shall be painted in letters and figures of black upon a white ground the christian name and surname of the proprietor, or of one of the proprietors of such hackney carriage."

Statute 6 and 7, Vict., c. 86, § 10, prohibits any person from acting as driver of a hackney carriage without a license.  Section 21 *Id.* requires that before the proprietor of a hackney carriage permits a licensed driver to take it out, he " shall require to be delivered to him, and shall retain in his possession, the license of such driver or conductor while such driver or conductor shall remain in his service."  Section 28 *Id.* makes the proprietor liable to a penalty for the misconduct of the driver; and Section 35 *Id.* compels the proprietor, when required, to produce the driver, and on failure to do so makes him liable to pay— exactly what does not appear.  Sections 23, 24 and 27 *Id.* are referred to in *Powles vs. Hider* as further authority for the position taken in that cause, but their substance is not given.

The Hawaiian statutes forbid the owner of a vehicle " to hire or allow the same to ply for hire within the District of Honolulu" without a hack license, and makes anyone in charge of the vehicle at the time the offense is committed liable as owner. They also require that all drivers of licensed hacks shall be themselves licensed; that the owner of such licensed hack " shall continually exhibit in a conspicuous place (presumably on the hack itself) the number of the license;" and provide for the issue of special drivers' licenses upon the application of hack owners, which " shall be used only and be valid so long as the person receiving the same shall remain in the employ of and drive for the person or persons making the application" therefor.

The hack regulations enacted by the Minister of the Interior, which by the statute have the force of law, contain nothing

that throws any light on this question, except, perhaps, the 28th section, which is as follows: " Any licensed vehicle, horse or harness found in service at any time in an unsuitable or unsafe condition for performing the duties of common carrier, will render the owner or driver, or both, liable to arrest and prosecution."

There is nothing in the Hawaiian statutes which corresponds to the English requirement that the owner of the hack shall obtain and hold the license of anyone driving the same, or to the one which makes the owner liable to a penalty for the misconduct of the driver, or to the one which compels the owner, when required, to produce the driver or become himself liable; but perhaps the most important difference of all is the absence ·in the Hawaiian law of the English regulation that every hack proprietor shall affix, with great distinctness, his " christian name and surname" to the hack. Our regulations merely provide that the number of the hack license shall be exhibited on a conspicuous part thereof, which circumstance cannot, under the reasoning of *Powles vs. Hider*, answer for the proprietor's " christian name and surname." That authority says, " the cab in question when hired by the plaintiff had upon it a plate with the name and surname of the· defendant as the proprietor. The proprietor who applies for and accepts a license to which this condition is annexed, and employs his cab under it, must be considered to hold himself out to the world as the proprietor, and he must incur the liabilities of proprietor to all who use the cab with the authority of the driver in the ordinary course of dealing. If the proprietor does not drive it himself, he declares that the driver is his servant." This is an argument which cannot be made where merely a number is affixed to the hack. This circumstance of the requirement that the owner's name shall be placed on the hack appears to be the leading feature of the English statutes bearing on the question, and in the authorities referred to is the main ground upon which the decisions were reached.

Our statute, on the other hand, besides the absence of the English provisions which support the theory that the driver is

the servant of the owner under the circumstances given, distinctly enacts, as noticed above, that anyone in charge of an unlicensed vehicle plying for hire, which of course means the driver, is to be regarded as the owner for the purposes of the law and is made liable for the penalty; and the hack regulations make the driver equally liable with the owner for using a licensed hack in an unsafe condition.

It is true that our statute, providing for the issue of special licenses to drivers upon the application of hack owners, refers to such drivers as being in the employ of and driving for the owners; but these words standing alone, without other enactments implying the relationship of master and servant, are not sufficient, in my mind, to support the theory of law claimed by the plaintiff, especially as they are only used incidentally to limit the extent of such licenses.

It therefore seems to me that the authorities relied on in the opinion of the Court are not applicable to the issue in this case under our statutes, which diverge so radically from the English statutes upon those very points under which the decisions referred to were rendered.

For the foregoing reasons I am unable to agree with the decision of the majority of the Court, and am of the opinion that the judgment appealed from should be reversed.

*A. P. Peterson,* for plaintiff.

*F. M. Hatch,* for defendant.